Ross Evan Pitcoff
New York Bar No. 4961751
ROSS PITCOFFF LAW
387 Park Avenue South, 5th Floor
New York, NY 10016
(646) 580-3204
ross@rosspitcofflaw.com

## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL SIMMONS, an individual<br><br>                Plaintiff,<br><br>       — against —<br><br>RIPPLE LABS, INC., a Delaware Corporation,<br>XRP II, LLC, a New York Limited Liability<br>Company,  and Bradley Garlinghouse, an individual.<br><br>            Defendants. | CASE NO.:<br><br>Hon.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Daniel Simmons ("Mr. Simmons"), through undersigned counsel, files this Complaint and brings this action against Defendants Ripple Labs, Inc., XRP II, LLC, and Bradley Garlinghouse for violations of Sections 5, 12(a), and 15 of the United States Securities Act of 1933 (the "Securities Act").  In support of his Complaint based upon his own knowledge and otherwise on information and belief, and upon further investigation of public filings, press releases and online posts, Mr. Simmons through counsel states as follows:

## PRELIMINARY STATEMENT

1.   Mr. Simmons brings this action against Ripple Labs, Inc. a Delaware Corporation, ("Ripple Labs"), XRP II, LLC ("XRP II"), a New York Limited Liability Company, and the Chief Executive Officer of Ripple Labs, Bradley Garlinghouse, for violations of the United States Securities Act.

2.   During the time period of November 2017 up and through February of 2019, Mr. Simmons purchased significant amounts of XRP, an unregistered, non-functioning and essentially unregulated digital currency that will purportedly be used to enable money transfers on Ripple Labs' "Ripple Network" – a currency exchange system that allows for cross-border international payments with a negligible transaction cost.

3.   Mr. Simmons, who is not an accredited investor, made investments in XRP with the reasonable expectation that his investments would yield profits. This expectation was created through a litany of misrepresentations set forth by Defendants that XRP was a sound investment and had an optimistic price attached to its future with respect to investor earning potential.  These misrepresentations, which Mr. Simmons relied upon, often conflated the promotion of Ripple's enterprise business usage with XRP such that the promotion of Ripple has become inextricably linked to the promotion of XRP.  *Mr. Simmons's ownership interest in XRP affords him no opportunity to participate in appreciation of XRP token coins at this time.*

4.   That XRP is an unregulated security is made evident by the fact that it is centralized and is not presently functional. Furthermore,  XRP tokens were *fully generated by Ripple* prior to their distribution.  Upon information and belief, all 100 billion XRP were created by Ripple

at its inception in 2013; 20 billion XRP, or 20 percent of the total amount of XRP coins in existence, were distributed to the individual founders of Ripple, with the remaining 80 billion being retained by Ripple.  While the number of XRP according to Ripple is permanently capped, XRP creation is entirely within Ripple's control, and as a practical matter there is nothing to stop Ripple from creating more XRP out of thin air.

5.   In contrast to, e.g., the Bitcoin network, where trust must be established through proof of work (derived from individuals "mining" for more Bitcoins),  XRP does not require *any* proof of work. Rather, XRP is generated by Ripple and then distributed.  Whereas the appreciation of value of Bitcoin can be attributed to the entrepreneurial efforts of its users through mining (thus establishing a "decentralized network"), in Ripple's case, Ripple itself is a key determining factor that drives XRP's value.  In other words, and upon information and belief, XRP's success is driven entirely by the promotional success and managerial efforts of Ripple, and Ripple is the only organization capable of distributing coins.

6.  Ripple's value proposition depends on the successful promotion of XRP, yet XRP is pre-functional and purchased by investors in anticipation of profit based upon the efforts of Ripple.

7.   Defendants have purportedly sold over $1.1 billion in XRP to retail consumers in exchange for legal tender and/or cryptocurrencies.   Upon information and belief, Ripple has engaged in extensive self-promotion in order to prop up the value of XRP – however, the price of Ripple, an unregulated security,  has fallen dramatically since 2018,  resulting in significant financial loss to Mr. Simmons.

8.  It is axiomatic that the Securities Act of 1933 requires registration with the Securities and

Exchange Commission when a security is being offered or sold. The purpose of these securities laws is to protect the public by requiring disclosures so that investors are in a position to understand the security that is being offered, and to have a basic idea of the risks associated with an investment in any given security. Absent such disclosures, there is a risk of significant asymmetries between the information espoused by management and promoters of the enterprise on the one hand, and investors and prospective investors on the other.

9. Pursuant to Section 2(a)(1) of the Securities act of 1933 ("Securities Act"), 15. U.S.C. § 77b(a)(1), a "security" is defined to include an investment contract. The SEC's Strategic Hub for Innovation and Financial Technology "FinHub") has published the Framework for Investment Contract Analysis of Digital Assets ("SEC Framework"). Therein the SEC Framework offers guidance in determining whether a crypto-token offering is a thinly-veiled attempt to shirk the Securities Laws of the United States. When taking into consideration the SEC Framework and applying it to the landmark ruling in *SEC V. W.J. Howey Co.*, 328 U.S. 293 (1946) ("Howey"), it is abundantly clear that the XRP token purchased and sold by Defendants has all the hallmarks of a security.

12. Specifically, Mr. Simmons provided monetary consideration, via payment in U.S. dollars and Bitcoin, in exchange for XRP. Mr. Simmons reasonably expected to obtain profits from his ownership of XRP, and Defendants have frequently highlighted the profit motive behind Ripple/XRP, going so far as to promote the increase in value of XRP through public representations.

13. Unlike other cryptocurrencies, XRP is *centralized* and the development of the XRP ledger, along with the profits that Mr. Simmons expected to derive therefrom, were and continue to be, based on the technical, managerial and entrepreneurial efforts of Defendants

and/or third-parties employed by Defendants.  Mr. Simmons does not, and cannot, engage in
the process of increasing the value of XRP, and there is no mining option available on the
XRP ledger.

14. In Spite of the realities set forth above, Defendants have failed to register XRP with the
SEC despite making significant representations which were designed to drive demand of
XRP, so as to procure greater returns to Defendants on their XRP sales. Mr. Simmons has
relied on the efforts of Ripple in the hope that their managerial efforts- which essentially
determine the success or failure of the enterprise-  would increase the success of XRP.  Mr.
Simmons' expectations at all times were reasonable based on the circumstances, and as a
result of Defendants' conduct he has suffered losses in excess of $119,000,000.00.

15. Mr. Simmons discovered the fraud committed upon him – namely that XRP is an
unregistered token in or around August of 2015, when a class-action lawsuit was filed against
the Defendants in the Northern District of California.

## THE PARTIES

16. Plaintiff Daniel Simmons is an individual who at all times mentioned was and is a
citizen of Queens, New York with an address of 172-06 125th Avenue, Jamaica, NY 11422.

17. Upon information and belief,  Mr. Simmons engaged in excess of 10,000 trades with
respect to XRP between November 2017 and February of 2019 and has sustained losses of
approximately $119, 206.22 as a result if his investments in the unregulated security XRP.

18. Defendant Ripple Labs, Inc. is a foreign corporation registered to do business in New
York with a principal place of business in San Francisco, California.

19. Defendant XRP II, LLC is a New York Limited Liability Company with a principal place
of business  in San Francisco, California.

20. Defendant Bradley Garlinghouse is an individual and the Chief Executive Officer of Ripple since January of 2017. Mr. Garlinghouse was the Chief Operating Officer of Ripple from April 2015 through December 2016. Upon information and belief, Mr. Garlinghouse has exercised control over Ripple and directed and/or authorized, directly or indirectly, the sale and solicitation of XRP to the public. Upon information and belief, Mr. Garlinghouse is a citizen of the State of California.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over claims arising under the Securities Act pursuant to 15. U.S.C. § 78aa and 28 U.S.C. § 1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367.

22. Specifically, Plaintiff Daniel Simmons seeks to recover damages sustained as a result of Defendants' unregistered and unqualified offers and sales of securities in violation of Section 5, 12(a)(1) and 15 of the Securities Act of 1933, 15 U.S.C.§ § 77e, 77l, and 77.

23. This Court has general jurisdiction over Defendants because they maintain offices in New York. This Court also has specific jurisdiction over Defendants in accordance with New York's long-arm statute and relevant jurisdictional provisions of the Federal Rules of Civil Procedure because all Defendants have sufficient minimum contacts with the forum district in a manner that pertains specifically to the activities and transactions at issue in this Action.

24. Venue is proper in this district under 28 U.S.C. § 1391 because Defendants Ripple Labs Inc. and XRP II LLC reside in this District.

25. Venue is also proper in this strict under 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to Defendants' liability occurred in this District.

26. Venue is further proper in this judicial district pursuant to 18 U.S.C.A. § 1965.

## FACTUAL BACKGROUND

27. Between November of 2017 and February of 2019, Plaintiff Mr. Simmons made in excess of 10,000 trades wherein he acquired XRP via cash and/or bitcoin, and then sold the unregulated security at a loss.

28. While Mr. Simmons had reasonably expected that Ripple's value in the marketplace would increase, this never took place.

29. Mr. Simmons has lost a total sum in excess of $119,000.00. as a result of his investment in the unregistered security XRP.

30. Mr. Simmons is not an accredited investor,  has suffered damages, and is entitled to a rescission of his purchases of XRP, along with interest accruing thereon.

## RIPPLE AND XRP'S STATUS AS AN UNREGULATED SECURITY

31. XRP is a non-functional digital coin token that will purportedly eventually be used to enable money transfers on Ripple Labs' "Ripple Network" – a gross settlement system, currency exchange and remittance network that allows for quick and secure cross-border payments with a negligible transaction cost.

32. Unlike other digital coins such as Bitcoin, which are decentralized and mined by users who validate transactions on the blockchain networks, all 100 billion XRP were created by Ripple without any functionality.

33. Upon information and belief, 20 Billion XRP were given to individual founders of Ripple, and a significant portion of XRP remain in escrow – held, controlled and distributed by Ripple.

34. According to Ripple's own Wikipedia page XRP is sold to promote Ripple, and XRP/Ripple is entirely managed and controlled by Ripple - "Ripple Labs sells XRP to fund its operations and promote the network.  This allows Ripple to have a spectacularly skilled team to develop and promote the Ripple protocol and network."

35. That Ripple controls the vast majority of the supply of XRP is evident according to its own published records.  Upon information and belief,  Ripple revenues are over one hundred million dollars per quarter selling XRP.

36. Defendants' primary source of income is sales of XRP to the public; CTO David Schwartz has all but confirmed the money-making efforts of Ripple through XRP:

> "[a]s a corporation, we are legally obligated to maximize shareholder value.  With our current business model, that means acting to increase the value and liquidity of XRP.  We believe this will happen if the Ripple network is widely adopted as a payment system.  We are pursuing multiple avenues at once.  One would expect increased demand to increase price."

37. Defendants' sales of XRP to the public accelerated significantly beginning in 2017 - upon information and belief, Defendants have earned over 1.1 billion dollars through the sale of XRP since the beginning of 2017.

35. Though akin to a stock, and not a cryptocurrency,  XRP is nevertheless sold to large investors and directly to the general public on cryptocurrency exchanges. There is little to no correlation between the purchase price of XRP and the market price of any goods or services that can be acquired in exchange for XRP, which has yet to be functionally adopted or used in any meaningful way.

38. Upon information and belief, this means that XRP coin holders have no means of

increasing the value of XRP (their investment), nor do they have anything of any real value in holding XRP.

39. Upon information and belief,  the vast majority of XRP coins that have been sold and/or distributed by Defendants is being used for investment purposes and *not* for bridging international transactions, rendering XRP non-functional, and hence, a security.

40.  Upon information and belief, Ripple controls the amount of XRP in the marketplace, and sells them via exchanges.   There are no opportunities for third parties to mine XRP, essentially eviscerating any argument that XRP is "decentralized" like its Bitcoin and Ethereum cryptocurrency brethren.

## DEFENDANTS MARKET XRP AS A SECURITY OFFERING

41. Defendants have marketed XRP to the public in order to drive demand and increase the value of XRP.  Mr. Simmons' reliance on many of these marketing and advertising schemes is entirely reasonable.

42.  Indeed, and upon information and belief, Ripple's website has or had an entire section providing advice on how to purchase XRP, and contains discussions of its performance in the marketplace.

43.  Ripple has also promoted the availability of XRP on exchanges for purchase, and has referred to XRP as the "fastest and most scalable [digital] asset on the market… [t]he market is taking notice of XRP's speed, reliability and scalability – which has strengthened the demand for XRP and where it's listed… we're proud to announce that XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide."

44.  As an example,   Mr. Garlinghouse, Ripple's CEO, has on numerous occasions strongly

promoted investments in XRP.  As just one example, he tweeted an article on December 22, 2017 titled "Bitcoin is So 2017 as Ripple Soars at Year End," and included a caption "I'll let the headline speak for itself. $xrp."  There can be no explanation other than the one that speaks in reality – Ripple's CEO publicly seeks to increase the value of XRP.

45.  Ripple has also paid its lobbyists with XRP, and Chris Larsen, a co-founder of Ripple, board member, and  Ripple's former CEO, indicated "It gives them some upside and gives them some risk… Hopefully it gives them a taste of the industry in a way that hits home."

46. Moreover, Defendants have conflated Ripple's Enterprise Solutions, (e.g. xCurrent and xVia) with XRP to further drive demand.  Specifically, Defendants often merge statements regarding other financial products with statements concerning XRP as part of a grander scheme to increase the value of XRP and maximize profits.

## DEFENDANTS OFFER TO PAY EXCHANGES TO FURTHER DRIVE DEMAND

47.  Upon information and belief, Ripple made attempts in 2017 to pay crypto currency exchanges to list XRP and further drive demand for the token, and to make XRP more easily available to be invested in by a larger audience.

48. According to Bloomberg "a Ripple executive asked whether a $1 million cash payment could persuade Gemini to list XRP in the third quarter" of 2017.

49. Upon information and belief, Ripple further "said it would be willing to lend [Coinbase] more than $100 million worth of XRP to start letting users trade the asset."

50. Upon information and belief, Gemini and Coinbase both declined to pursue Ripple's proposal at that time.

51. During the same late 2017 to early 2018 time period, rumors that XRP would be added to

Coinbase fueled a massive price increase.  Upon information and belief, Defendants were the source of these remors.

52. Moreover, and upon information and belief, Ripple has also limited the supply of XRP, all in rather blatant efforts to drive price appreciation of XRP.

53.  As an example, in an  article posted on Ripple's website on or about May 16, 2017, Garlinghouse proclaimed, "Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity. We engage in distribution strategies that we expect will result in a strengthening XRP exchange rate against other currencies…we have heard concerns in the market about uncertainty surrounding our ongoing XRP distribution. The root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a scenario that would be bad for Ripple! Our self-interest is aligned with building and maintaining a healthy XRP market."

54. Garlinghouse proceeded to say that he was committed to remove "that uncertainty by committing to place 55 billion XRP into a cryptographically-secured escrow account," which would allow investors to "mathematically verify the maximum supply of XRP that can enter the market."

55.       Finally, Mr. Garlinghouse stated "XRP is the only digital asset with a clear use case . . .  Designed for enterprise use, XRP can be used by financial institutions for on-demand liquidity for cross-border payments. Payment providers and banks using XRP will gain greater access to emerging markets and much lower settlements costs, and this is why we remain committed to increasing XRP liquidity and continued decentralization of its ledger."

56. XRP's price increased rapidly following the announcement, and Ripple's "Q2 2017 XRP

Markets Report" listed the escrow announcement as "instrumental in helping to drive XRP interest and volume…. The market responded favorably to the escrow announcement."

57. It is clear that despite false claims and representations to the contrary made by Defendants, XRP is a security subject to SEC registration requirements.

## SUCCESS OF XRP IS DEPENDENT UPON DEFENDANTS' EFFORTS

58. The Defendants are entirely responsible for updating and maintaining the XRP ledger. As previously mentioned, unlike cryptocurrencies such as Bitcoin and Ethereum, which use a Proof of Work ("PoW") consensus mechanism to verify the legitimacy of transactions on the network, the XRP Ledger relies on trusted nodes *operated by Ripple* to verify legitimacy of transactions and maintain agreement on the network.

59. The PoW mechanism utilized by Bitcoin and Ethereum ensures the network is decentralized by allowing *anyone to use their own hardware and electricity* to run the PoW consensus algorithm to verify transactions on the public ledger and send them to be recorded throughout the blockchain. This ledger is decentralized because the decision making process is placed within the hands of those who run the consensus algorithm with their own hardware and electricity.

60. In stark contrast, and upon information and belief, the XRP Ledger consensus protocol relies almost entirely on "trusted nodes" on the Unique Node Lists ("UNL"). The UNL is the set of trusted nodes that communicate "reliable" information to other nodes on the XRP Ledger. Like miners in Bitcoin and Ethereum, these "trusted nodes" validate transactions.

61. However, *unlike those miners, the trusted nodes are either selected or controlled by Ripple itself.*

62. Further, and upon information and belief, Ripple provides its own default and recommended UNL—currently comprised of only five Ripple-hosted nodes.

63. Although Ripple claims it plans someday in the future to eventually decentralize the network, it admits that it will only remove its own "trusted nodes" if it decides that other validator nodes are reliable, reputable, stable, and secure. Ripple's view of potential decentralization of the XRP Ledger still involves Ripple maintaining full control over the Ledger and deciding who owns and operates any third-party "trust-nodes." It is abundantly clear that XRP is centralized, and a security.

## XRP CONSTITUTES A SECURITY

64. The SEC Framework offers an analysis as to whether a digital asset possesses the characteristics of one particular type of security—an "investment contract."

As explained in the SEC Framework:

The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities.

65. Plaintiff Mr. Simmons has invested in XRP by giving money to a common enterprise- namely, the Defendants. Plaintiff Mr. Simmons had a reasonable expectation that he would obtain profits based upon the efforts of the promotor, Ripple, due to many admissions by the Defendants and their officers, that XRP would increase and appreciate in value. Ripple marketed and advertised XRP as a security by constantly promoting the appreciation of XRP. Ripple also maintains control over its centralized ledger. XRP was

sold as a non-functional token coin, and unlike Bitcoin or Ethereum, it is not mined by individual users.

66.      Plaintiff only recently discovered the fraud committed upon him; namely the fact that Ripple/XRP is an unregistered security. Upon information and belief, this discovery was made at or around the time of the filing of a class action lawsuit in California on or about August 5, 2019, entitled *In re Ripple Labs Inc. Litigation* under Case No. 4:18-cv-06753-PJH.

67.      Plaintiff is entitled to a rescission of his investments plus interest accruing thereon.

### **AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Unregistered Offer and Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act)**

68.  Plaintiff repeats and realleges each and every allegation referenced above as if set forth herein at length.

69. Defendants made us of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

70. XRP constitute securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

67. Plaintiff Mr. Simmons purchased XRP securities from Defendants.

68. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

69.  Plaintiff only recently discovered this fraud committed upon him – namely the unregistered status of XRP, in or around August of 2019 when he learned about a class action lawsuit filed against the Defendants concerning XRP.

70.  By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c) and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a).

71. As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff Mr. Simmons has suffered damages in connection with his purchases of XRP securities.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS RIPPLE LABS, INC. AND BRADLEY GARLINGHOUSE
### (Violation of Section 15 of the Securities Act)

72.  Plaintiff repeats and realleges  each and every allegation  referenced above as if set forth herein at length.

73. Upon information and belief, Defendants Ripple Labs Inc. and Bradley Garlinghouse were the Control Persons ("Control Persons") under Section 15 of the Securities Act, 15 U.S.C. § 77o.

74. The Control Persons, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act.

75. The Control Persons had the power and influence, and exercised the power and influence, to cause the unlawful offer and sale of XRP securities as described at length herein.

76. The Control Persons, separately or together, possess, either directly or indirectly, the power to direct or cause the direction of the management and policies of XRP II, through ownership of voting securities, by contract, subscription agreement or otherwise.

77. The Control Persons also have the power to direct or cause the direction of the

management and policies of Ripple.

78.  The Control Persons, separately or together, have sufficient influence to have caused XRP II
and/or Ripple to submit a registration statement, but failed to do so.

79. The Control Persons, separately or together, jointly participated in and/or aided and abetted,
XRP II and/or Ripple's failure to register XRP.

80. By virtue of the alleged conduct herein, the Control Persons are liable for the wrongful
conduct complained of herein and are liable to Plaintiff Mr. Simmons for rescission, plus
interest.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment as follows:

i.    On the First Cause of Action, Plaintiff is entitled to a rescission due to Defendants'
securities violations, and is entitled to judgment against Defendants in an amount to be
determined at trial not less than $119, 206.22 plus interest, costs, disbursements and
reasonable attorney's fees for bringing this action;

ii.   On the Second Cause of Action, Plaintiff is entitled to a rescission due to Defendants'
securities violations, and is entitled to judgment against Defendants in an amount to be
determined at trial not less than $119, 206.22, plus interest, costs, disbursements and
reasonable attorney's fees for bringing this action;

iii.  On all Causes of Action, Plaintiff seeks a declaration that XRP is a security and that
Defendants' unregistered sales of XRP violated applicable laws;

iv.  Awarding Plaintiff such other and further relief as this Court deems just and proper.

**Plaintiff demands a jury trial on all issues so triable.**

Dated: New York, New York
       March 12th, 20220

                                        Yours etc.,

                                        **ROSS PITCOFF LAW**

                                        /s/ Ross E. Pitcoff
                                        Ross E. Pitcoff, Esq.
                                        Attorney for Plaintiff
                                        387 Park Avenue South, 5th Floor
                                        New York, NY 10016
                                        T: (646) 580-3204
                                        E: Ross@rosspitcofflaw.com